**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**ANDRÉ DACRES**

        **Petitioner,**

**v.**                                  **CASE NO.: 3:23-cv-00527-SVN**

**LAKAE T. McGOWAN**

        **Respondent.**

_____/

**PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        Petitioner, André Dacres (the "Father"), by and through his undersigned attorneys, files his Proposed Findings of Fact and Conclusions of Law against the Respondent, Lakae T. McGowan (the "Mother"), and states as follows:

**I.**        **Introduction.**

        1.        The parties' daughter, DKD (born in 2019) (the "child" or "DKD") has lived in Jamaica for nearly her entire life. The parties shared joint custody of DKD on a joint agreed-upon co-parenting schedule, spending approximately equal time with DKD in Jamaica. She attended school in Jamaica, has extended family and friends in Jamaica, and her entire life has always been based in Jamaica.

        2.        The Mother removed DKD from Jamaica in February 2022, first to Vermont and then to Connecticut, after the U.S. State Department had written to the Mother about the abduction and after the Mother had retained counsel in Vermont. The Father seeks the return of DKD to Jamaica under the Convention on the Civil Aspects of International Child Abduction, done at the

Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA"). The Father has met his *prima facie* burden under the Hague Convention for the Court to order the return of DKD to Jamaica. The Mother has not met her burden to establish any exceptions to return. The Father's Petition for Return is therefore granted and the child shall be returned to Jamaica.

## II.    Proposed Findings of Fact.[3]

### A.    Family History and Removal of the Child from Jamaica.

3.    The Mother and Father are citizens of Jamaica, and lived in Jamaica until the Mother removed the child to Vermont from Jamaica on or about February 4, 2022.

4.    The parties met and began their relationship in Jamaica in 2004. They moved in together as a family in 2018 when they learned that the Mother was pregnant with the child.

5.    The Mother's mother, Elaine Johnson Barber (the "Maternal Grandmother"), lives in Vermont. The Mother and Father agreed for the child to be born in Vermont, and thereafter to live with the parties in Jamaica.

6.    In or about October 2018, the Mother travelled to Vermont for the child's birth. The Father was not able to travel with the Mother to the United States because he needed to continue to work in Jamaica to support the family financially. The Father does not have, and did not have at the time of the child's birth, immigration status that allows him to live or work in the United States.

---

[1]  T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986).
[2]  22 U.S.C. 9001 *et seq*.
[3] Except where otherwise indicated, each factual conclusion is based on the testimony of the Father.

7.      The child was born in Vermont in January 2019. The Mother and child then immediately returned home to Jamaica in February 2019.

8.      After the child's birth and her return home to Jamaica, the Mother, Father, and child continued to live together as a family in Jamaica. The Mother and Father were both fully involved in the child's day-to-day family and cultural life, and in providing for the child's needs in Jamaica when they lived together as a family. The Father has always been the sole or primary income earner for the family, and he has always provided for all of the child's financial welfare.

9.      In or about August 2019, the Mother became upset when she learned that the Father had gone to lunch with a female colleague to celebrate the colleague's birthday. The Mother demanded that the Father give her his mobile phone so that she could read his messages. The Father allowed the Mother to read his messages and then took back his phone. The Mother then locked the Father inside the parties' home and threatened him with a knife. The Father managed to let himself out of the house. He stayed with family for a few days to give the Mother time to cool down. The parties were able to discuss the issue and resolve it, and the Father returned to the family home where the family continued to live together until June 2021.

10.      The Mother and Father separated in June 2021. After their separation, the parties each continued to live in Jamaica.

11.      The Mother and Father agreed to co-parent the child after their separation. The child spent overnight time with each party at their respective homes in Jamaica each week on a set schedule that the parties agreed for the child. There is no court order issued by any court in Jamaica or anywhere else in the world relating to the child. The parties have joint rights to the child under Jamaican law as explained *infra*.

12.     The parties operated their agreed-upon co-parenting schedule for the child from the time of their separation in June 2021, until the Mother removed the child from Jamaica in February 2022.

13.     The Mother and Father were both fully involved in the child's day-to-day family and cultural life, and in providing for the child's needs in Jamaica, both before and after their separation.

14.     Before the Mother removed the child from Jamaica, the child received medical care in Jamaica and attended private school in Jamaica. The child's school has held a place open for DKD to resume her attendance at school in Jamaica when she returns home. The child has participated in sports, music, and other cultural activities in Jamaica. The Mother and Father were both fully involved in all such activities with the child.

15.     Before the Mother removed the child from Jamaica, the child was fully involved and immersed in day-to-day family life and cultural life in Jamaica.

16.     The child has extended family—grandparents, aunts and uncles, and cousins— in Jamaica, and has always regularly spent time with her extended family in Jamaica.

17.     In or about October 2021, there was an unfortunate argument between the parties. The Mother broke into the Father's home and physically assaulted him. The Mother then called the police and claimed that the Father had abused her. The Father was arrested based upon the Mother's claims to the police officer. The case against the Father was dismissed.

18.     After the October 2021 incident, the parties continued to operate on their agreed-upon co-parenting schedule. The child continued to spend overnight time with each party at their respective homes in Jamaica.

19.     The Mother and Father have never agreed together for the child to live anywhere other than Jamaica.

20.     On Friday, February 4, 2022, the Father dropped the child off at school in Jamaica in the morning. Under the parties' agreed-upon co-parenting schedule, the Mother was to pick the child up from school that Friday, and the child was to be with the Mother until school drop-off on the morning of Tuesday, February 8, 2022. The Father was to pick up the child after school on February 8, 2022 for the child's scheduled co-parenting time with him.

21.     On February 7, 2022, the Father received an email from the Mother, in which the Mother told the Father for the first time that she was leaving with the child for the United States. The Father later learned from the child's teacher that the child had not attended school on Monday, February 7, 2022.

22.     It turned out that the Mother had already removed the child from Jamaica to the United States over the weekend of February 4-6, 2022.

23.     After the Mother left Jamaica with the child, the Mother blocked the Father from contacting her on social media. The Father tried to contact the Mother by telephone and email. In the Father's emails to the Mother, he attempted to locate the child, offered to send financial support to the child, and attempted to see the child (even if it meant seeing the child in the United States). The Mother did not respond to most of the Father's attempts to contact her. The Mother did not ever return to Jamaica with the child.

24.     On April 1, 2022, the Father therefore promptly submitted his Hague Convention Application for Return to the Central Authority for Jamaica, seeking the return of the child to Jamaica. Despite the Father's prompt submission of his Hague Convention Application to the Central Authority for Jamaica, several months passed before the Central Authority for Jamaica

processed the application and transmitted it to the United States Central Authority, the United States Department of State Office of Children's Issues.

25.     The United States Central Authority ("State") was unable to find any Vermont attorney to represent the Father until it reached out to Miles & Stockbridge P.C. in Washington, D.C. State then provided the Father's counsel with the address where it had determined that the Mother and child were located: 187 Brooklyn Street, Apt. 1, Morrisville, Vermont 05661. Vermont counsel for the Mother communicated with State after State had corresponded with the Mother at that address.

26.     The Father first filed his Petition for Return in the United States District Court for the District of Vermont on October 11, 2022. The case was transferred to this Court by agreement of the parties after the Mother provided verification to the federal court in Vermont that she and the child had relocated to the District of Connecticut. The Father has promptly and to the best of his ability undertaken all legal steps available to him to seek the return of the child to Jamaica.

**B.     The Child's Habitual Residence is Jamaica.[4]**

27.     The determination of a child's habitual residence in Hague Convention cases "presents a task for factfinding courts." *Monasky v. Taglieri*, 140 S.Ct. 719, 730 (2020) (citations omitted). The Supreme Court in *Monasky* explains as follows:

> A child's habitual residence presents what U.S. law types a "mixed question" of law and fact—albeit barely so. The inquiry begins with a legal question: What is the appropriate standard for habitual residence? Once the trial court correctly identifies the governing totality-of-the-circumstances standard, however, what remains for the court to do in applying that standard . . . is to answer a factual question: Was the child at home in the particular country at issue? The habitual-residence determination thus presents a task for factfinding courts, not appellate courts, and should be judged on

---

[4] The factual finding aspect of the habitual residence element is addressed here. The legal conclusions relating to habitual residence are addressed in Section III *infra*.

appeal by a clear-error review standard deferential to the factfinding court.

*Id*. at 730 (internal quotations and citations omitted).

28.    Considering the testimony and documentary evidence adduced at the evidentiary hearing, applying the totality-of-the-circumstances standard, as fully set forth above, this Court finds as a matter of fact that the habitual residence of the child was Jamaica at the time the child was removed from Jamaica. *See* Section II (A) *supra*.

29.    The child's entire life is based in Jamaica. She has always lived in Jamaica and has extended family in Jamaica. She receives healthcare in Jamaica, has always attended school in Jamaica, has friends in Jamaica, and is involved in extracurricular activities in Jamaica. The child's school has held a place open for her to resume attendance at school in Jamaica when she returns. Indeed, the Father dropped the child off at school in Jamaica on Friday, February 4, 2022 in accordance with the parties' agreed-upon co-parenting schedule. He expected to pick the child up from school in Jamaica on Tuesday, February 8, 2022 after the child's co-parenting time with the Mother. But the Mother removed the child from Jamaica and only told the Father she had done so after the child was in the United States. Jamaica was the entire focus of the child's life until the Mother removed her to the United States. This Court finds as a matter of fact that Jamaica was the child's habitual residence on the date the Mother removed the child from Jamaica to the United States.

## III.    Proposed Conclusions of Law - Petitioner's *Prima Facie* Case.

### A.    Hague Convention Standards.

30.    The Hague Convention was adopted to address and discourage the problem of international unilateral action by one parent. *See Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014). Through the adoption of the Hague Convention, the States Parties, including Jamaica, have sought

"to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble; *see also* Hague Convention, art. 1; ICARA § 9001; *Abbott v. Abbott*, 560 U.S. 1, 8 (2010); *Ermini v. Vittori*, 758 F.3d 153, 160 (2d Cir. 2014); *Velozny v. Velozny*, 550 F. Supp. 3d 4, 13 (S.D.N.Y. 2021).

31.     The primary purpose of the Hague Convention is "to restore the pre-abduction status quo." *Chafin v. Chafin*, 568 U.S. 165, 169-70 (2013); *Velozny*, 550 F. Supp. 3d at 13. "The Convention's central operating feature is the return remedy." *Abbott* 560 U.S. at 9. When there has been a wrongful [removal or] retention, the country to which the child has been removed generally must order the prompt return of the child. *Id*.

32.     The scope of a court's inquiry under the Hague Convention is limited to the merits of the claim for wrongful removal or retention. Hague Convention, art. 16, 19; ICARA § 9001(b)(4). The merits of any underlying custody case are therefore not at issue and cannot be considered. *Velozny*, 550 F. Supp. 3d at 13 (citing *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012)). The return remedy therefore "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." *Lozano*, 572 U.S. at 5.

33.     The International Child Abduction Remedies Act ("ICARA") is the Convention's implementing legislation in the United States. It establishes straightforward procedures for the operation of the Hague Convention in the United States by defining and allocating burdens of proof for claims and discretionary exceptions under the Convention. ICARA § 9001 *et seq.* ICARA requires that a petitioner under the Hague Convention establish, by a preponderance of

the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention."  ICARA § 9003(e)(1)(A).

34.     In order to establish a prima facie case of wrongful removal under the Convention and ICARA, the Father is merely to establish by a preponderance of the evidence that: (1) the habitual residence of the child at the time of the removal was Jamaica; (2) the removal breached the Father's semi-autonomous article 5*a* 'rights of custody' under Jamaican law; and (3) the Father was exercising 'rights of custody' at the time of the removal or would have been so exercising its rights but for the removal. Convention, art. 3. When the Father establishes by a preponderance of the evidence that the Mother's removal of the child was wrongful within the meaning of the Convention, the child's return is required forthwith pursuant to article 12 of the Convention, unless in its discretion the Court sustains one or more of the narrow exceptions to return.

**B.     The Child's Habitual Residence Was Jamaica on the Date of Removal.**

35.     In 2020, the Supreme Court issued its Opinion in the *Monasky v. Taglieri* case, holding that ". . . a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. 719, 723 (2020). In so holding, the Supreme Court adopted a uniform standard, similar to the standard that had been employed by the Seventh Circuit, which rejected "rigid rules, formulas, or presumptions" in making habitual residence determinations. *Redmond v. Redmond*, 724 F.3d 729, 746 (7th Cir. 2013).

36.     In its discussion of habitual residence, the *Monasky* Court explained that in general, a child "resides where she lives." *Monasky*, 140 S. Ct. at 726. The term "habitual" suggests a fact-sensitive inquiry. *Id*. "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id*. (citing

*Redmond*, 724 F.3d at 744). The Supreme Court has instructed that no single fact is dispositive across all cases. *Id*. It has further instructed that:

> Common sense suggests that some cases will be straightforward:
> Where a child has lived in one place with her family indefinitely,
> that place is likely to be her habitual residence.

*Monasky*, 140 S. Ct. at 727 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3rd Cir. 2006)). This case is one of the straightforward cases.

37.     The drafting history of the Convention is instructive as to how a court analyzes the totality of the circumstances in making a habitual residence determination. *Monasky*, 140 S. Ct. at 727. The drafters intentionally chose the phrase "habitual residence" for its "factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." *Id*. (citing Anton, 30 Int'l & Comp. L. Q. 537, 544 (1981) (history of the Convention authored by the drafting commission's Chairman)). The Supreme Court explained that the drafter's choice is instructive because it indicates that the signatories "sought to afford the courts maximum flexibility to respond to the particular circumstances of each case." *Id*. (citations omitted). The Supreme Court then summarized the analysis stating "[t]he bottom line: there are no categorical requirements for establishing a child's habitual residence . . ." *Id*. at 728.

38.     Factual findings on habitual residence have been set forth in Section II *supra* because the determination of a child's habitual residence in Hague Convention cases "presents a task for factfinding courts." *Id*. at 730. The Supreme Court in *Monasky* explains as follows:

> A child's habitual residence presents what U.S. law types a "mixed
> question" of law and fact—albeit barely so. The inquiry begins with
> a legal question: What is the appropriate standard for habitual
> residence? Once the trial court correctly identifies the governing
> totality-of-the-circumstances standard, however, what remains for
> the court to do in applying that standard . . . is to answer a factual
> question: Was the child at home in the particular country at issue?
> The habitual-residence determination thus presents a task for

> factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court.

*Id*. at 730 (internal quotations and citations omitted).

39.     The evidence adduced by the Father at the evidentiary hearing establishes that this case is one of the straightforward habitual residence analyses anticipated by the *Monasky* Court. The child has lived in Jamaica since she was only one month old. She has always lived in Jamaica and has extended family in Jamaica. She receives healthcare in Jamaica, has always attended school in Jamaica, has friends in Jamaica, and is involved in extracurricular activities in Jamaica. The child's school has held a place open for her to resume attendance at school in Jamaica when she returns.

40.     The Father dropped the child off at school in Jamaica on Friday, February 4, 2022 in accordance with the parties' agreed-upon co-parenting schedule. He expected to pick the child up from school in Jamaica on Tuesday, February 8, 2022 after the child's co-parenting time with the Mother. But the Mother removed the child from Jamaica and only told the Father she had done so after the child was in the United States.

41.     The testimony and documentary evidence considered here under the totality-of-the-circumstances standard, establish as a matter of fact that the habitual residence of the child was Jamaica at the time the Mother removed the child from Jamaica.

**C.     Rights of Custody to the Child Under Jamaican Law.**

42.     After determining the child's habitual residence, the Court next considers the 'rights of custody' to the child at the time of removal. Whether a petitioner has article *5a* 'rights of custody' to a child is determined based upon the law of the child's habitual residence. Under the Convention, "removal or retention of a child is deemed wrongful when it is in breach of rights

of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal." Convention, art. 3*a*; *Ermini*, 758 F.3d at 161. 'Rights of custody' include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5.

43.     Rights of custody are to be construed broadly. "The Convention's intent is for courts to invoke in the widest possible sense the law of the child's habitual residence." *Palencia v. Perez*, 921 F.3d 1333, 1339 (11th Cir. 2019) (citing Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Convention on the Civil Aspects of International Child Abduction ¶ 67 (1982)).[5] The intention of the Convention is ". . . to protect all the ways in which custody of children can be exercised, and the Convention favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Id.* (emphasis in original) (citing *Hanley v. Roy*, 485 F.3d 641, 645 (11th Cir. 2007)). "The violation of a *single* custody right suffices to make removal wrongful." *Palencia*, 921 F.3d at 647 (emphasis in original and citations omitted).

44.     So here. The evidence adduced at the evidentiary hearing establishes that the Father had (and continues to have) 'rights of custody' to the child under Jamaican law at the time the Mother removed the child from Jamaica. The Declaration of Jamaican Law by attorney Charles

---

[5] The Pérez-Vera Report is the official commentary to the Convention. *Simcox v. Simcox*, 511 F.3d 594, 604, n.3 (6th Cir. 2007) (quoting United States Department of State Legal Analysis, 51 Fed. Reg. 10494, 10503 ("Professor Perez-Vera's explanatory report is recognized by the [Hague Conference on Private International Law] as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.")).

Young of the Jamaican Central Authority, establishes the 'rights of custody' element of the Father's *prima facie* case. (Doc. No. 9; Pet. Ex. 1).

45.     At the time the Mother removed the child from Jamaica, the Father had (and continues to have) rights of custody to the child under Jamaican law by operation of law under the Jamaican Child Care & Protection Act (CCPA) 2004 and the Jamaican Children (Guardianship and Custody) Amendment Act 2017.  *See* Pet. Ex. 1; Doc. No. 9.

46.     There is no court order issued by any court in Jamaica or anywhere else in the world relating to the child at issue in this case. The parties, as the parents of the child, have joint custody of the child under Section 2(4)(a) of the CCPA. *Id*. Under the Jamaican Children (Guardianship and Custody) Amendment Act 2017, custody rights are defined to include the right to determine the child's place of residence. *Id*.

47.     Joint parental rights are 'rights of custody' under Article 5*a* of the Hague Convention. The Father has these rights by operation of law without any orders having been entered relating to the child by any Jamaican court, and he had these rights at the time the Mother removed the child from Jamaica. *See* Dep't of State Legal Analysis, 51 Fed. Reg. (1986), at p.10 ¶1(b) ("Two persons, typically mother and father, can exercise joint custody … by operation of law prior to the entry of a decree. … Now, from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is wrongful ….").

48.     In considering whether a party has 'rights of custody' the Court may "take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decision which would otherwise be applicable." Convention, art. 14; *see also* FRCP 44.1; *see also E. Sussex Children Servs.*, 919 F. at 729 (N.D.

W. Va. 2013). The Court may consider affidavits or declarations of foreign law to establish rights of custody. *See Whallon v. Lynn, 230* F.3d 450, 455 (1st Cir. 2000). This Court has done so through its admission of the Declaration of Jamaican Law into evidence. The Declaration establishes the 'rights of custody' element of the Father's *prima facie* case.

**D.    Exercising Rights of Custody.**

49.    The final element of the Father's *prima facie* case is that the 'rights of custody' were being exercised at the time the child was removed from Jamaica, or would have been exercised but for the removal. 'Rights of custody' are only to be considered not exercised by a petitioner if the child has been abandoned. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004). No such evidence has been adduced here because there has been no such abandonment. The Father has never abandoned the child.

50.    The evidence therefore establishes all three elements required under the Hague Convention to establish by a preponderance of the evidence standard that the child was wrongfully removed from Jamaica. The Convention therefore requires that the child be returned to Jamaica forthwith. Convention, art. 12. The return remedy is the only remedy available under the Convention. The Court may only decline to return the child if the Mother can establish one of the five narrow discretionary exceptions to return. The Mother has not established any of the Hague Convention exceptions, as fully set forth in Section IV *infra*. The Father's Petition for Return is therefore granted and the child shall be returned to Jamaica forthwith.

**IV.    <u>None of the Narrow Discretionary Exceptions Apply</u>.**

51.    There are certain narrow discretionary exceptions to return under the Convention, that allow a Court in its discretion to decline to return a child even when a petitioner has met their burden of establishing a wrongful removal by a preponderance of the evidence. *See* Convention

arts. 13 and 20. In her Answer, the Mother asserts every exception provided for in the Convention. There is no factual basis for any of the exceptions asserted by the Mother. Each exception the Mother asserts in her Answer is addressed below.[6]

**A.    Consent & Acquiescence Exceptions.**

52.    Under article 13*a* of the Hague Convention, the court is not bound to return a child if the respondent establishes that the petitioner consented to or subsequently acquiesced in the retention. The Mother must establish a consent or acquiescence exception by a preponderance of the evidence. ICARA § 9003(e)(2)(B). As with the other defenses, the consent and acquiescence exceptions must be drawn very narrowly. *Larbie*, 690 F.3d at 308. There is no evidence whatsoever to support a finding of either consent or acquiescence.

53.    The narrow discretionary exceptions of consent and acquiescence are "analytically distinct" concepts. *Nicolson v. Pappalardo*, 605 F.3d 100, 103 (1st Cir. 2010); *see also Baxter v. Baxter*, 423 F. 3d 363, 371 (3d Cir. 2005); *Larbie*, 690 F.3d at 308-310. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Nicolson*, 605 F.3d at 105. Both exceptions are to be narrowly construed.  *Id.*

54.    To establish the consent exception, a respondent must "establish by a preponderance of the evidence that petitioner had the 'subjective intent' to permit the respondent to remove *and* retain the child for an indefinite or permanent period of time." *Id*. The acquiescence

---

[6] The Mother also characterizes her challenge to the Father's *prima facie* case as three separate "special defenses." *See* Doc. No. 100 at p. 9-10 ("First Special Defense – Habitual Residence"; "Second Special Defense – No Wrongful Taking"; and "Third Special Defense – No Wrongful Retention"). The Court need not address the Mother's challenge to the Father's *prima facie* case again here. The Court has found that the Father has established his *prima facie* case. *See* Section II *supra*.

analysis requires a more formal act or statement by a petitioner in order for a respondent to prove the affirmative defense. "More than an isolated statement to a third party" is required to prove acquiescence by a preponderance of the evidence. *Friedrich v. Freidrich*, 78 F.3d 1060, 1070 (6th Cir. 1996). "Acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id*. "Acquiescence tends to require more formality than consent – *e.g.,* testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time . . . . When attempting to characterize ambiguous conduct as a basis for inferred acquiescence, courts employ a pure subjective intent inquiry . . . of the parent who is claimed to have acquiesced." *Darin*, 746 F. 3d at 16.

55.    Neither consent nor acquiescence can be established here. The Father never consented in advance for the child to be removed from Jamaica to the United States indefinitely, permanently, or for any period of time at all. The Father did not know that the Mother was removing the child from Jamaica until they had already left Jamaica. He could not possibly have consented.

56.    The emails the Father sent to the Mother attempting to locate the child, offering to send financial support to the child, and attempting to see the child (even if it meant seeing the child in the United States) do not constitute acquiescence. The Father has never once made any statements renouncing his rights to the child and has never testified that he has ever agreed for the child's habitual residence to be anything other than Jamaica. The Father took immediate action to pursue the child's return to Jamaica. He submitted a Hague Application to the Jamaican Central Authority. He did not participate in the Mother's Connecticut state court protective order case. The

Father has only ever demonstrated a consistent attitude of seeking the child's return—not of acquiescing in the Mother's removal and retention of the child from Jamaica to the United States.

**B.    "Well-Settled" Exception.**

57.    The well-settled exception may only be invoked when a petitioner fails to file a petition for return within one year of the wrongful removal or retention. Hague Convention art. 12; *see also Lozano*, 572 U.S. at 5.  Under the Convention, if a petition for return is filed more than one year after the wrongful removal or retention, a court may decide, in its discretion, not to return the child at issue if it is demonstrated that the child is now settled in its new environment. *Id*. But the exception is *only* available if more than one year passed between the date of retention and the filing of the petition for return.

58.    This Court has made findings of fact that the child was removed from Jamaica on or about February 4, 2022. *See* Section II *supra*. The Court has further found that the Father filed his Petition for Return on October 11, 2022. *See* Section II *supra*; *see also* Doc. No. 105 (Order holding Father's Petition shall be treated as having been filed in this Court on October 11, 2022— the date on which it was filed in the United States District Court for the District of Vermont). The Father filed his Petition for Return on October 11, 2022—less than one year after the date of removal. The well-settled exception therefore does not apply.

**C.    Article 13*b* Grave Risk & Intolerable Situation Exception.**

**1.    Grave Risk.**

59.    The Mother asserts as a part of her "Fourth Special Defense" that return of the child to Jamaica will create a grave risk of psychological harm to the child. She alleges that she has been subjected to domestic violence in Jamaica by the Father. The Mother has the burden to prove the grave risk exception by clear and convincing evidence. ICARA § 9003(e)(2)(A). The clear and

convincing evidence standard in the Second Circuit means "something more than a preponderance of the evidence and something less than beyond reasonable doubt." *U.S. v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (citing *Addington v. Texas*, 441 U.S. 418, 431 (1979)). The grave risk exception "is to be interpreted narrowly lest it swallow the rule." *Jacquety*, 538 F. Supp. 3d at 333.

60.     There is a very high bar required in the Second Circuit for a respondent to meet its burden on the grave risk exception:

> A grave risk of harm from repatriation arises . . . in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection. The potential harm to the child must be severe, and the . . . level of risk and danger required to trigger this exception has consistently been held to be very high. The grave risk involves not only the magnitude of the potential harm, but also the probability that it will materialize.

*Id.* (quoting *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013)); *see also Ermini*, 758 F.3d at 164.

61.     The Fourth Circuit takes a similar approach to the Second Circuit and explains the approach to analyzing grave risk as follows:

> In thinking about these problems, we acknowledge that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm – those that do not rise to the level of gravity required by the Convention – evaporate.

*Miller v. Miller*, 240 F.3d 392, 402 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996)).

62.     Here, the abducted-from country is Jamaica. The evidence adduced at the evidentiary hearing did not establish that there is a grave risk in returning the child to Jamaica. Even if the Court had credited the Mother's testimony with respect to her allegations of domestic

violence (which the Court does not), those allegations do not create a grave risk to the child. The Mother sought relief in the Jamaican Court, and then she herself abandoned her case and removed the child to the United States instead. There is no evidence before this Court to establish that the Jamaican court system would not have been able to address the Mother's claims had she not abandoned them. The United States and Jamaican court systems—as treaty partners under the Hague Convention—trust one another to do so.

63.     The Mother did not prove by any evidentiary standard—certainly not by the clear and convincing evidence standard—that the child will be subjected to any risk of harm upon return to Jamaica. There is no grave risk in returning the child to Jamaica.

### 2.    Intolerable Situation.

64.     The Mother also asserts the second prong of the Article 13*b* exception—intolerable situation. She does not assert any separate factual basis for the intolerable situation prong of the exception. The Mother has the burden to prove an intolerable situation by clear and convincing evidence. ICARA § 9003(e)(2)(A). The evidence adduced at trial does not support the Mother's assertion that return to Jamaica will create an intolerable situation for the child. *See* Sections II, III (C)(1) *supra*.

### 3.    Ameliorative Measures Will Ensure the Child's Safe Return.

65.     Even if the this Court were to make a finding of grave risk or intolerable situation— a standard the Mother cannot meet—the Court still has the discretion to return the child to Jamaica. *Golan v. Saada*, 142 S. Ct. 1880, 1887 (2022). The "discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion whether to consider ameliorative measures that could ensure the child's safe return." *Id*. at 1893. But that "discretion is not a whim." *Id*. (quotation omitted). Courts considering Hague Convention cases ".

. . ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case . . ." *Id*.

66.    The Supreme Court has provided guidance to lower courts on the consideration of ameliorative measures. *Id*. at 1893-94. Firstly, consideration of ameliorative measures must prioritize the child's physical and psychological safety. *Id*. Secondly, consideration of ameliorative measures must not usurp the role of the court that will adjudicate the underlying custody dispute. *Id*. Thirdly, consideration of ameliorative measures must accord with the Convention's requirement that courts act expeditiously in Hague Convention proceedings. *Id*.

67.    If the Mother had met her very high clear and convincing burden, which she did not, the Father submitted it would then have been appropriate to order a return with ameliorative measures. *See* Doc. No. 102 (Pet. Amended Compl. at ¶ 66). The Court finds that if the Court had determined return to Jamaica would otherwise constitute a grave risk or intolerable situation to the child, any of the ameliorative measures proposed by the Father would ensure the child's safe return to Jamaica, without usurping the role of the Jamaican courts, and in the expeditious manner required by the treaty. *See Golan*, 142 S. Ct. at 1895. But the Court need not address ameliorative measures any further or order any ameliorative measures because neither grave risk nor intolerable situation have been established here.

**D.    Article 20 Human Rights Exception.**

68.    Article 20 of the Convention provides that return may be refused if it "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention, art. 20; *see, e.g. Hulsh v. Hulsh*, 2020 WL 11401634, *9 (No. 19-C-7298, N.D. Ill., Jul. 21, 2020). The Mother has the burden to the human rights exception by clear and convincing evidence. ICARA § 9003(e)(2)(a). There is not one

scintilla of evidence here that returning the child to Jamaica will violate the United States' fundamental principles of human rights.

69.     The article 20 human rights exception must be restrictively interpreted and applied. *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603,614 (E.D. Va. 2002); *see also Guerrero v. Oliveros*, 119 F. Supp. 3d 894 (N.D. Ill. 2015).  It is intended for the rare circumstance in which a return would "utterly shock the conscience of the court or offend all notions of due process." *Hulsh*, 2020 WL 11401634, *9 (citing Dep't of State Legal Analysis, 51 Fed. Reg. at 10510 (1986). The exception does not provide a mechanism for courts in the United States to "pass judgment on the political system from which the child was removed." *Id*.

70.     The Mother here has not identified a single case in which a respondent has met the burden to establish the article 20 exception to return in an American court. In fact, American jurisprudence has yet to recognize a circumstance with one of our treaty partners in which the exception has been established  *See, e.g. Hulsh*, 2020 WL 11401634, *9 (denying an Article 20 defense and returning children to Slovakia even when the court found that a Slovakian custody order at issue would likely have been unlawful for lack of due process had it been entered by an American court); *Guerrero*, 119 F. Supp. 3d at 916 (denying an Article 20 defense and returning children to Mexico despite high rates of domestic violence; noting that the "respondents have not provided and the court was unable to find, a single case where the court refused to return a child based on Article 20). The Mother has not adduced any evidence in support of her Article 20 exception. The exception does not apply.

## V.     <u>Conclusion</u>.

71.     The child's habitual residence is Jamaica. The Father had (and continues to have) rights of custody to the child on the date of removal and was exercising those rights or would be

been so exercising those rights but for the removal. None of the discretionary exceptions apply. The child shall be returned forthwith to Jamaica. The Petitioner's counsel shall prepare and submit forthwith their proposed Return Order.

Respectfully submitted,

/s/ Kelly A. Powers
Stephen J. Cullen, *Pro Hac Vice*
Kelly A. Powers, *Pro Hac Vice*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of June, 2023, a copy of the foregoing Proposed Findings of Fact and Conclusions of Law was electronically filed, and that it is available for viewing and downloading from the ECF system by all counsel of record.

/s/ Kelly A. Powers
Kelly A. Powers, *Pro Hac Vice*
