Pp. 96-114 in Freeman, M. & Taylor, N. (2023)(Eds.) *Research Handbook on International Child Abduction: The 1980 Hague Convention.* UK: Edward Elgar. DOI: https://doi.org/10.4337/9781800372511.00019

# 7.  Fleeing for safety: Helping battered mothers and their children using Article 13(1)(b)

*Jeffrey Edleson,[1] Sudha Shetty and Mary Fata*

## INTRODUCTION

The Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction (hereafter the Convention) starts by stating in its first lines 'that the interests of children are of paramount importance'.[2]

The Convention is an essential international instrument for the orderly return of children when they have been wrongfully removed or retained in breach of rights of custody. We maintain, however, that much of the implementation of the Convention has lost sight of this primary goal to protect the safety and interests of children when fathers or male partners have been abusive toward the children's mothers. We argue for greater sensitivity – on the part of the Permanent Bureau as well as courts and governments implementing the Convention – to the fact that exposure to adult-to-adult domestic violence often poses a grave risk or intolerable situation for children in the home.

## ARTICLE 13(1)(B)

Concerns about children's wellbeing led the Convention's drafters to include several exceptions to children's prompt return. The exceptions were intended to allow judicial discretion when addressing dangers that would result from the return of children to their country of habitual residence. The drafters of the Convention had the foresight in 1980 to predict that there may be dangerous situations that would preclude the return of children to their habitual residences and specifically laid out several exceptions or defences, including Article 13(1)(b) which states:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that – b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.[3]

In her Explanatory Report of the Convention, Pérez-Vera states:

---

[1]    The two senior authors wish to acknowledge the support of the Rockefeller Foundation for providing a one-month residency at its Bellagio Center in Italy in March 2022 during which this chapter was completed.
[2]    Convention, Preamble.
[3]    Convention, Article 13(1)(b).

> … it has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore, the Convention recognises the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children.[4]

Pérez-Vera continues in her anchoring interpretation:

> Thus, the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in the new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.[5]

National courts have also expressed the importance of child safety. For example, the United Kingdom's Supreme Court stated that 'the fact that the best interests of the child are not expressly made a primary consideration in Hague Convention proceedings, does not mean that they are not at the forefront of the whole exercise'.[6]

The assumption in 1980 when the Convention was drafted was that taking parents were unlikely to be the primary caregivers of their children and that the Convention would aid in the return of children to their primary caregiving parents, usually their mothers.[7] What the drafters did not anticipate in 1980 was that the great majority (73 per cent) of taking parents would now be mothers, most of whom (80 per cent) are the primary carer or joint-primary carers of their children.[8] Many of these mothers raise allegations of domestic violence by the left-behind father.[9] The Article 13(1)(b) exception, and subsequent interpretations of it, have led attorneys and advocates for battered mothers worldwide to argue that returning a child to their habitual residence in such circumstances exposes the child to grave risk, thus meeting the requirements of this exception.[10] That is, returning a child to a country or residence where an abusive ex-partner is at high risk of continuing to expose the child or his or her mother to continuing violence should pose a grave risk or intolerable situation under this exception in the Convention.[11]

---

[4] Elisa Pérez-Vera, *Explanatory Report on the 1980 HCCH Child Abduction Convention* (HCCH, The Hague, 1981) at 432, para 25.

[5] Ibid., at 433, para 29.

[6] *Re E* (Children) (Abduction: Custody Appeal) [2011] UKSC 27 [2012] 1 AC 144, per Lady Hale and Lord Wilson.

[7] B Hale, 'Taking Flight – Domestic Violence and Child Abduction' (2017) *Current Legal Problems* 70, 1–14.

[8] N Lowe and V Stephens, *Part I – A Statistical Analysis of Applications Made in 2015 under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction – Global Report* (HCCH, The Hague, No. 11A of February 2018) at 7–8.

[9] Merle Weiner notes that, in two samples of US Hague Convention appellate cases in 2000–2001 and 2017–2018, allegations involving domestic violence were present in 78 per cent of the cases: MH Weiner, 'You Can and You Should: How Judges Can Apply the Hague Abduction Convention to Protect Victims of Domestic Violence' (2021) *UCLA Women's Law Journal* 28(1), 223–332. See also HCCH, *Domestic and Family Violence and the Article 13 'Grave Risk' Exception in the Operation of the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction: A Reflection Paper* (HCCH, The Hague, May 2011).

[10] Hale (n 7).

[11] There is a separate relevant discussion of what defines a child's 'habitual residence' and how coercion and violence may force, or deceive, mothers into relocation to residence in another country, as well as how to determine if a child is 'well settled'. A more detailed discussion of these issues can

### 'A Coach and Four' through the Convention

Despite the Article 13(1)(b) exception being an integral part of the Convention and expressing the well-founded concerns of the drafters, it is often regarded as potentially undermining the Convention's intent by thwarting the return of children to their habitual residence. These concerns about the application of Article 13(1)(b) have been widely voiced and have led to its interpretation in a narrow light. For example, Pérez-Vera continued in her Explanatory Report by stating, 'This implies above all that they [the exceptions] are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter'.[12]

Silberman has expressed concern that investigations of abuse allegations will undermine the goal of returning children to their habitual residence. In arguing for a narrower use of grave risk, she stated that: ' … if extensive and full-scale hearings replete with expert testimony become the norm whenever allegations of spousal and/or child abuse are raised, the summary nature of return proceedings … will be frustrated'.[13]

Furthermore: '… by equating a finding of "traumatic stress disorder" resulting from return for further custody proceedings with "grave risk of psychological harm", the court greatly expands the possibilities for non-return under the Convention'.[14]

More famously, judges have expressed a concern that permitting retention by the taking parent may drive 'a coach and four' horses through the Convention, thus making it ineffective.[15] These concerns continued to be echoed in the development[16] and final published version of the Article 13(1)(b) Guide to Good Practice from the Permanent Bureau.[17]

### Adult Domestic Violence Presents a Grave Risk to Children

A finding of domestic violence by a father against a mother should rightly expand the possibility of disallowing return of a child to his or her country of habitual residence, despite the

---

be found in T Lindhorst and JL Edleson, *Battered Women, Their Children and International Law: The Unintended Consequences of the Hague Child Abduction Convention* (Northeastern University Press 2012); R Schuz, 'Thirty Years of the Hague Abduction Convention: A Children's Rights' Perspective' in A Diduck, N Peleg and H Reece (eds), *Law in Society: Reflections on Children, Family, Culture and Philosophy – Essays in Honour of Michael Freeman* (Koninklijke Brill NV, 2015, 607–33); R Schuz, Habitual Residence of the Child Revisited: A Trilogy of Cases in the UK Supreme Court' (2014) *Child and Family Law Quarterly* 26(3), 342–62; MH Weiner, 'Uprooting Children in the Name of Equity' (2010) *Fordham International Law Journal* 33(2), 409–86; T Vivatvaraphol, 'Back to Basics: Determining a Child's Habitual Residence in International Child Abduction Cases under the Hague Convention' (2009) *Fordham Law Review* 77(6), 3325–69.

[12]    Pérez-Vera (n 4) at 434, para 34.

[13]    L Silberman, 'The Hague Child Abduction Convention Turns Twenty: Gender Politics and Other Issues' (2000) *New York University Journal of International Law and Politics* 33, 221–50, at 236.

[14]    Ibid., at 239.

[15]    See J Reddaway and H Keating, 'Child Abduction: Would Protecting Vulnerable Children Drive a Coach and Four Through the Principles of the Hague Convention?' (1997) *The International Journal of Children's Rights* 5, 77–96; see also Lord Donaldson MR, Neill and LJJ Butler-Sloss *Re C (A Minor) (Abduction)* [1989] 1 FLR 403 [10]; LLJ Butler-Sloss, LJA Thorpe, and LJJ Mummery *Re C. (Abduction: Grave Risk of Physical or Psychological Harm)* [1999] 2 FLR 478.

[16]    Hale (n 7) at 8.

[17]    HCCH, *Guide to Good Practice under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction*, Part VI, Article 13(1)(b), The Hague 2020.

aforementioned concerns. There are decades of well-established research that now clearly link a child's exposure to adult-to-adult domestic violence with significant negative physical and psychological outcomes. In addition, the few research studies published to date on the aftermath of Convention cases reveal a heightened risk of continuing harm to children who return to their country of habitual residence, and often into the custody of their abusive father.[18]

Many of these research findings have been summarised in a recent set of publications by Megan Holmes and her colleagues at Case Western Reserve University in the United States (US). For example, a recent systematic review of 26 studies[19] found clear evidence that children exposed to domestic violence show lower social and emotional competence and fewer empathetic skills than non-exposed children. A separate systematic review of 13 studies[20] found that children exposed to domestic violence also more strongly endorsed the use of violence in relationships than comparison children.[21] Over prior decades, numerous studies[22] have shown that a child's exposure to adult domestic violence may result in poorer academic achievement, more externalising behaviours by boys, such as physical aggression and threatening behaviour, and evidence of more internalising behaviour among girls, such as anxiety and sleep disorders.[23]

Exposure to adult domestic violence does not only present possible grave psychological risks for children. There are also physical risks often associated with violence exposure. A review of 23 studies that included information on physiological outcomes found that children's exposure to domestic violence was associated with a variety of negative physiological impacts as well as a decreased ability to regulate their physiological responses to stressful events.[24] Supporting this finding is a recent study of 30 young children exposed to domestic violence that showed these children's hypervigilance resulted in increased brain wave activity

---

[18]  See, e.g., Lindhorst and Edleson (n 11).

[19]  AE Bender, SJ McKinney, MM Schmidt-Sane, J Cage, MR Holmes, KA Berg, J Salley, M Bodell, EK Miller, and LA Voith, 'Childhood Exposure to Intimate Partner Violence and Effects on Social-emotional Competency: A Systematic Review' (in press) *Journal of Family Violence* https://doi .org/10.1007/s10896-021-00315-z, accessed 18 January 2023.

[20]  KE Evans, MM Schmidt-Sane, AE Bender, KA Berg, MR Holmes, 'Children's Exposure to Intimate Partner Violence and Acceptance or Appraisals of IPV: A Systematic Review' (in press) *Journal of Family Violence* https://doi.org/10.1007/s10896-021-00318-w, accessed 18 January 2023.

[21]  We surmise that sending a child back to their habitual residence, often into contact with or custody of the abusive father, could result in a child believing that the violence is condoned or approved of by adults.

[22]  See SE Evans, C Davies and D Dilillo, 'Exposure to Domestic Violence: A Meta-analysis of Child and Adolescent Outcomes' (2008) *Aggression and Violent Behaviour* 13, 131–40; DA Wolfe, CV Crooks, V Lee, A McIntyre-Smith and PG Jaffe, 'The Effects of Children's Exposure to Domestic Violence: A Meta-analysis and Critique' (2003) *Clinical Child and Family Psychology Review* 6, 171–87; KM Kitzmann, NK Gaylord, AR Holt and ED Kenny, 'Child Witnesses to Domestic Violence: A Meta-analytic Review' (2003) *Journal of Consulting and Clinical Psychology* 71, 339–52; L Kiesel, K Piescher and JL Edleson, 'The Relationship Between Child Maltreatment, Intimate Partner Violence Exposure, and Academic Performance' (2016) *Journal of Public Child Welfare* 10, 434–546.

[23]  Evans (n 20).

[24]  KA Berg, KE Evans, G Powers, SE Moore, S Stelgerwald, AE Bender, MR Holmes, A Yaffe and AM Connell, 'Exposure to Intimate Partner Violence and Children's Physiological Functioning: A Systematic Review' (in press) *Journal of Family Violence* https://doi.org/10.1007/s10896-022-00370 -0, accessed 18 January 2023.

100    *Research handbook on international child abduction*

when making perceived mistakes.[25] Such brainwave activity is associated with greater levels of anxiety and sensitivity to perceived threats. This study, and a number of others, have found that early childhood exposures to violence resulted in negative developmental impacts years, and even decades, later.[26]

Exposure to violence at home has also been linked to bullying of other children across numerous studies.[27] In addition, a large-scale longitudinal study found that children who were exposed to violence were two times more likely to become abusive, or to be abused, in their adult relationships.[28]

Weiner has argued that such exposure *alone* is sufficient to establish grave risk to the child and that 'judges often misstate the legal test embodied in Article 13(b)' since the text of the Article states 'there is a grave risk that his or her return would *expose* the child to physical or psychological harm or otherwise place the child in an intolerable situation'.[29]

Beyond exposure, the presence of adult domestic violence has also long been associated with greater risk of the children in the home being physically or sexually abused. For example, Hamby and her colleagues' US national survey found that 56.8 per cent of children exposed to adult domestic violence were also physically abused.[30] These findings are similar to earlier reviews that found a median of 41 per cent of families experienced both domestic violence and child abuse in the same households.[31] In addition, children often physically intervene when attempting to stop the violence. In our study of the co-occurrence of domestic violence and child abuse, we found that 23 per cent of children physically intervened to stop violence

---

[25]    EN Palmwood, EA Valadez, LA Zajac, AL Griffith, RF Simons and M Dozier, 'Early Exposure to Parent-perpetrated Intimate Partner Violence Predicts Hypervigilant Error Monitoring' (2022) *International Journal of Psychophysiology* https://doi.org/10.1016/j.ijpsycho.2022.01.006, accessed 18 January 2023.

[26]    MK Ehrensaft, P Cohen, J Brown, E Smailes, H Chen, and JG Johnson, 'Intergenerational Transmission of Partner Violence: A 20-year Prospective Study' (2003) *Journal of Consulting and Clinical Psychology* 71(4), 741–53; MR Holmes, 'The Sleeper Effect of Intimate Partner Violence Exposure: Long-term Consequence of Young Children's Aggressive Behaviour' (2013) *Journal of Child Psychology and Psychiatry* 54(9), 986–95; MR Holmes, LA Voith and AN Gromoske, 'Lasting Effect of Intimate Partner Violence Exposure During Preschool on Aggressive Behaviour and Prosocial Skills' (2015) *Journal of Interpersonal Violence* 30(10), 1651–70; AD Paradis, HZ Reinherz, RM Giaconia, WR Beardslee, K Ward and GM Fitzmaurice, 'Long-term Impact of Family Arguments and Physical Violence on Adult Functioning at Age 30 Years: Findings from the Simmons Longitudinal Study' (2009) *Journal of the American Academy of Child and Adolescent Psychiatry* 48, 290–98; RM Yates, MF Dodds, LA Sroufe and B Egeland, 'Exposure to Partner Violence and Child Behavior Problems: A Prospective Study Controlling for Child Physical Abuse and Neglect, Child Cognitive Ability, Socioeconomic Status and Life Stress' (2003) *Development and Psychopathology* 15, 199–218.

[27]    D Alvarez-Garcia, T Garcia and JC Nunez, 'Predictors of School Bullying Perpetration in Adolescence: A Systematic Review' (2015) *Aggression and Violent Behavior* 23, 126–36.

[28]    CL Whitfield, RF Anda, SR Dube and VJ Felitti, 'Violent Childhood Experiences and the Risk of Intimate Partner Violence in Adults: Assessment in a Large Health Maintenance Organization' (2003) *Journal of Interpersonal Violence* 18, 166–85.

[29]    Weiner (n 9) at 316; Article 13(1)(b) (n 3), emphasis added.

[30]    S Hamby, D Finkelhor, H Turner and R Ormrod, 'The Overlap of Witnessing Partner Violence with Child Maltreatment and Other Victimizations in a Nationally Representative Survey of Youth' (2010) *Child Abuse and Neglect* 34, 734–41.

[31]    AE Appel and GW Holden, 'The Cooccurrence of Spouse and Physical Child Abuse: A Review and Appraisal' (1998) *Journal of Family Psychology* 12, 578–99; JL Edleson, 'The Overlap Between Child Maltreatment and Woman Battering' (1999) *Violence Against Women* 5(2), 134–54.

against their mothers.[32] We also found that over a third (37.8 per cent) of children were accidently hurt during a violent event against their mother and that over a quarter of children (26.1 per cent) were intentionally hurt during violence against their mother.[33]

Research on domestic violence has also revealed how men who batter often undermine effective parenting by mothers.[34] More concerning, is research that has revealed how battering results in brain injuries to 75–85 per cent of women victims, thus affecting their ability to function.[35]

Finally, grave risk is not only concerned about a child's past experiences, but also the risk of future experiences and situations that may endanger the child. The research on domestic violence that occurs after a couple has separated clearly indicates that violence does not stop just because the ex-partners are living separately. In fact, the risk of lethal domestic violence is many times greater among separated couples when compared to cohabiting couples.[36] Our research on Convention cases has also revealed that some mothers and children who returned to the country of habitual residence were exposed to new incidents of violence at the hands of the left-behind father.[37]

This reading of the Convention and accompanying case law shows that many courts have begun recognising that adult domestic violence poses a grave risk to children. This is evident from cases across the US reversing return orders or rejecting Hague petitions when presented with evidence of adult domestic violence.[38] In fact, courts recognise that 'domestic violence is

---

[32]   JL Edleson, LF Mbilinyi, SK Beeman and HK Hagemeister, 'How Children are Involved in Adult Domestic Violence: Results from a Four-city Telephone Survey' (2003) *Journal of Interpersonal Violence* 18(1), 18–32.

[33]   LF Mbilinyi, JL Edleson, SK Beeman and AK Hagemeister, 'What Happens to Children When Their Mothers are Battered? Results from a Four-city Anonymous Telephone Survey' (2007) *Journal of Family Violence* 22, 309–17.

[34]   L Bancroft, JG Silverman and D Ritchie, *The Batterer as Parent: Addressing the Impact of Domestic Violence on Family Dynamics* (2nd edn, Sage Publications 2012); JL Edleson, LF Mbilinyi and S Shetty, *Parenting in the Context of Domestic Violence* (Judicial Council of California 2003); S Levesque, C Rousseau, G Lessard, M Blgaouette, M Fernet, A Valderrama and C Boulebsol, 'Qualitative Exploration of the Influence of Domestic Violence on Motherhood in the Perinatal Period' (2022) *Journal of Family Violence* 37, 275–87.

[35]   EM Valera and H Berenbaum, 'Brain Injury in Battered Women' (2003) Journal of Consulting and Clinical Psychology 71(4), 797–804; TE Galovski, BN Smith, RL Micol and PA Resick, Interpersonal Violence and Head Injury: The Effects on Treatment for PTSD' (2021) *Psychological Trauma: Theory, Research, Practice and Policy* 13(3), 376–84.

[36]   D Ellis, N Stuckless and C Smith, *Marital Separation and Lethal Domestic Violence* (Elsevier 2015).

[37]   Lindhorst and Edleson (n 11).

[38]   *Miltiadous v. Tetervak* 686 F.Supp.2d 544 (E.D. Pa. 2010): 'Respondent's evidence of spousal abuse compels a finding that the grave risk of harm affirmative defense applies here' (at 554); *Sabogal v. Velarde* 106 F.Supp.3d 689, 705–06 (D. Md. 2015):

> Thus, although this case involves little or no physical abuse, the magnitude of the psychological abuse is unique. Here, the children were 'forced to engage' in verbal abuse of the mother when they were required to hear and repeat their father's explicit verbal tirades and direct threats.

*Luis Ischiu v. Gomez Garcia*, 274 F.Supp.3d 339, 354 (D. Md. 2017): The court found grave risk based on spousal abuse and abuse by the petitioner's family towards the respondent.

102    *Research handbook on international child abduction*

a common inciter to "abduction" [when] the abused spouse flees and takes her children with her'.[39]

Several courts and federal circuits in the US have established that adult domestic violence can pose a grave risk to children. The Seventh Circuit issued two leading opinions reversing return orders based on the Article 13(1)(b) grave risk exception. In 2012, the Seventh Circuit reversed and vacated a return order because the district court did not allow a psychological evaluation of the child and did not adequately address domestic violence allegations during the hearing.[40] The court stated that '[w]hile the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence'.[41] In 2005, the Seventh Circuit reversed a return order in light of evidence of adult domestic violence stating that '[i]f handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over'.[42]

Other US circuits take similar approaches to the Article 13(1)(b) grave risk exception, finding that the psychological and physical effects of adult domestic violence on children must be considered when reviewing a Hague petition. For example, in *Walsh v. Walsh*, the First Circuit considered social science evidence that exposure to adult domestic violence harmed children.[43] The court reversed a return order based on a father's psychological abuse of his children and physical abuse of the mother in their presence.[44] The US Ninth Circuit has also concluded that adult domestic violence should be factored into grave risk determinations.[45] In *Tsarbopoulos v. Tsarbopoulos*, the Eastern District of Washington held that spousal abuse should be considered when deciding grave risk 'because of the potential that the abuser will also abuse the child'.[46] In *Krishna v. Krishna*, the Northern District of California rejected a Hague petition '[i]n light of the prior history of alleged abuse and discord that has existed between the parties'.[47] The court acknowledged 'little evidence that relocation of the child to Australia poses a grave threat of physical harm to the child' but found 'compelling evidence establishing the potential for serious psychological harm' based on the father's domestic violence.[48]

The US Eleventh Circuit has also held that the grave risk exception applied after a father verbally and physically abused the mother and threatened to harm the child, but did not

---

[39]    *Colchester v. Lazaro* 16 F.4th 712, 717 (9th Cir. 2021); see also *Khan v. Fatima* 680 F.3d 781, 784 (7th Cir. 2012); *Van De Sande v. Van De Sande* 431 F.3d 567, 568 (7th Cir.2005).

[40]    *Khan v. Fatima* 680 F.3d 781, 786–87 (7th Cir. 2012).

[41]    Ibid., at 784 (quoting Merle Weiner, 'Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction' (2002) *Columbia Human Rights Law Review* 33, 275, 278–79).

[42]    *Van De Sande v. Van De Sande* 431 F.3d 567, 571 (7th Cir. 2005).

[43]    *Walsh v. Walsh* 220 F.3d 204, 221 (1st Cir. 2000) ('credible social science literature establishes that serial spousal abusers are also likely to be child abusers').

[44]    Ibid., at 221.

[45]    See *Colchester v. Lazaro* 16 F.4th 712, 717 (9th Cir. 2021).

[46]    *Tsarbopoulos v. Tsarbopoulos* 176 F.Supp.2d 1045, 1057-58 (ED Wash. 2001). ED Wash. is in the Ninth Circuit.

[47]    *Krishna v. Krishna* No. C 97–0021 SC 1997 WL 195439 at *4 (N.D. Cal. Apr. 11, 1997).

[48]    Ibid., at *4.

physically abuse the child.[49] The court did not require evidence showing that the child had been previously physically or psychologically harmed. The district court only had to find that returning the child would 'expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation'.[50] In addition, in *Sadoun v. Guigui*, the Southern District of Florida found grave risk citing incidents of domestic violence that included restricting the mother's access to financial resources, physical abuse, verbal abuse, and coercive behaviour. The court added that a lack of police reports or hospital records should not count against the testimony of a domestic violence victim and her children.[51]

State courts in the US have also found grave risk after a respondent presented evidence of adult domestic violence. In *Noergaard v. Noergaard*, the California Court of Appeals reversed an order of return after the lower court did not properly consider the domestic violence allegations holding that 'domestic violence or child abuse constitutes a grave risk to the child'.[52] In 2020, the Illinois Court of Appeals acknowledged a 'shift toward recognizing domestic violence as posing a grave risk'.[53] The court cited a congressional resolution expressing that adult domestic violence puts children at risk of physical and psychological injury.[54]

Finally, courts in countries outside the US have also found that a history of domestic violence met the burden for an Article 13(1)(b) defence. In *Achakzad v. Zemaryalai*, a Canadian court found that grave risk of harm to the child's primary caregiver constituted grave risk of harm to a child[55] and, in *Pollastro v. Pollastro*, the court noted that 'as a matter of common sense […] returning a child to a violent environment places that child in an inherently intolerable situation, as well as exposing him or her to a serious risk of psychological and physical harm'.[56] In the UK, the court in *DT v. LBT* noted that harm to a primary caretaker is relevant to finding grave risk.[57] In Ireland, the Supreme Court affirmed a lower court's rejection of a Hague petition based on the mother's uncontested affidavit detailing a history of domestic violence.[58] In *Case of Neulinger and Shuruk v. Switzerland*, the European Court of Human Rights (ECtHR) concluded that Switzerland's Federal Court ordering a child's return under

---

[49]   *Baran v. Beaty* 526 F.3d 1340, 1346 (11th Cir. 2008); see also *Gomez v. Fuenmayor* 812 F.3d 1005, 1014 (11th Cir. 2016), it 'requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child'.

[50]   *Baran* 526 F.3d at 1346.

[51]   *Sadoun v. Guigui* No. 1:16-cv-22349-KMM 2016 WL 4444890 at *6 (S.D. Fla. Aug. 22, 2016): 'Courts frequently recognize that victims of spousal abuse often do not come forward to report instances of domestic violence for many reasons and, therefore, a lack of near-contemporaneous documentation does not necessarily render a victim's claims unbelievable.' Ibid*. at *8. S.D. Fla. is in the Eleventh Circuit.

[52]   197 Cal.Rptr.3d 546, 552 (Cal. Ct. App. 2015).

[53]   *In re MVU* 178 N.E.3d 754, 762 (Ill. App. Dec. 3, 2020).

[54]   See H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990).

[55]   *Achakzad v. Zemaryalai* [2010] Carswell Ont 5562 [13].

[56]   *Pollastro v. Pollastro* [1999] 43 OR (3d) 497 (CA); see also, *Al-Hadad v. Al Harash* (2020) ONCJ 269 [74] (Can): 'Ongoing abusive conduct by the father towards the mother and the child is more than likely and would place the child in an intolerable situation.'

[57]   *DT v. LBT (Abduction: Domestic Abuse)* [2011] Fam Law 220; see also *Re S (A Child)* [2012] UKSC 10, [2012] 2 AC 257 [34]:

The critical question is what will happen if, with the mother, the child is returned. If the court concludes that, on return, the mother will suffer such anxieties that their effect on her mental health will create a situation that is intolerable for the child, then the child should not be returned.

[58]   *PF v. MF* unreported, Supreme Court of Ireland 13 January 1993.

the Convention violated Article 8 of the European Convention on Human Rights (ECHR).[59] In this case, the mother alleged domestic violence including incidents of physical assault and verbal abuse. The ECtHR observed that the Convention 'requires the prompt return of the abducted child unless there is a grave risk … [i]n other words, the concept of the child's best interests is also an underlying principle of the Hague Convention'.[60] The ECtHR continued that 'a child's return cannot be ordered automatically or mechanically when the Hague Convention is applicable' and courts must consider the best interests of a child to comply with Article 8 of the ECHR.[61] The court highlighted the mother's difficulties if she returned to Israel, including criminal sanctions for removing her child, and the father's financial difficulties and inability to care for the child full-time.

Our review has just touched on the extensive social science evidence and case law that supports a conclusion that a child's exposure to adult domestic violence will likely present both current and future risks for ongoing physical and psychological damage to the child. We, therefore, argue that the Convention's drafters were prescient in their inclusion of Article 13(1)(b) and that courts and governments must recognise the dangers of returning a child to an environment where there is a high risk of continuing exposure to violence.

### Undertakings and Mirror Orders are Rarely Enforced

The Permanent Bureau's Guide to Good Practice on Article 13(1)(b) strongly suggests the use of measures to protect children on return to their habitual residence, especially when grave risk may be evident. These usually take the form of voluntary undertakings by a left-behind parent or mirror orders issued by the courts in the country of habitual residence. Unfortunately, there is little knowledge about the degree to which voluntary undertakings or mirror orders are enforced after a Convention case is concluded. This lack of information was noted in the report of a 2017 Experts' Meeting, co-hosted in London by Marilyn Freeman and the HCCH Permanent Bureau, which also called for more data to be gathered on the short- and long-term outcomes for children involved in Convention proceedings and the impact and effectiveness of post-return protective measures, such as undertakings and mirror orders.[62]

The few studies available on cases from the UK and US indicate that undertakings and mirror orders designed to protect children on their return to their habitual residences are rarely enforced. For instance, the reunite International Child Abduction Centre's study of cases in the UK revealed that two-thirds (67 per cent) of the undertakings issued – including *all* those focused on a child's safety upon return – were not implemented in the country of habitual residence. Even when judges issued mirror orders, only one in five of those mirror orders was implemented as planned.[63] Our own research of US incoming cases has also revealed that both judges and attorneys were sceptical of the enforcement of these orders by another country's courts and that mothers who returned with their children to the country of habitual

---

[59]   *Neulinger v. Shuruk and Switzerland* App no 41615/07 (ECtHR, 10 July 2010).

[60]   Ibid., at 137.

[61]   Ibid., at 138.

[62]   University of Westminster, *Report of the Experts' Meeting on Issues of Domestic/Family Violence and the 1980 Hague Child Abduction Convention* (University of Westminster, London, 2017).

[63]   reunite Research Unit, *The Outcomes for Children Returned Following an Abduction* (reunite International Child Abduction Centre, UK, 2003).

residence would frequently face violations of previously agreed undertakings by their abusive ex-husbands or mirror orders that were seldom enforced.[64]

Many US courts have recognised that undertakings and mirror orders are ineffective and put children at risk. Several US federal circuits affirmed that respondents do not have to prove that 'the child's country of habitual residence is unable or unwilling to ameliorate the grave risk of harm which would otherwise accompany the child's return'.[65] Perhaps most notably, in *Van De Sande v. Van De Sande*, the US Seventh Circuit found that courts do not need to consider the home country's ability to protect the child.[66] In *Khan*, the US Seventh Circuit reiterated this sentiment.[67] Because of the danger that domestic violence poses to children, undertakings and mirror orders were found to be inadequate in protecting children. The court found that a protective order alone does not guarantee safety.[68] The US First Circuit has already dismissed the notion that undertakings are enough, stating that '[w]e have no doubt that the Irish courts would issue appropriate protective orders. That is not the issue. The issue is [the father's] history of violating orders issued by any court, Irish or American'.[69] The US Eleventh Circuit has taken a similar approach announcing that '[i]n this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm'.[70]

While courts and Central Authorities may believe they have taken steps to protect both the returning children and their mothers, the available evidence argues that these are overwhelmingly ineffective and unenforceable strategies.

## A DECADE OF CHANGE

The last decade has brought about many changes for the better when it comes to considering a child's exposure to domestic violence as a potential grave risk in Convention cases. We have seen positive changes at the Permanent Bureau, in the drafting of country-specific implementing legislation, in the training of judges, attorneys and advocates, and in court rulings that identify domestic violence exposure as a grave risk to children. This section reviews some of this progress.

**Guide to Good Practice**

The Sixth Meeting of the Convention's Special Commission reviewed a document on domestic and family violence prepared by the Permanent Bureau and concluded that a global guide

---

[64]   Lindhorst and Edleson (n 11).
[65]   *Baran v. Beaty* 526 F.3d 1340, 1348 (11th Cir. 2008); see also *Nunez–Escudero v. Tice–Menley* 58 F.3d 374, 377 (8th Cir. 1995), the court rejected the argument that, in order to apply grave risk as a defence, the respondent would have to show the habitual residence was 'unable to protect the child'; *Gomez v. Fuenmayor* 812 F.3d 1005, 1012 (11th Cir. 2016); *Davies v. Davies* 717 F. App'x 43, 49 (2d Cir. 2017), the court affirmed that ameliorative measures would not protect the child based on the father's escalating threats and his lack of credibility.
[66]   *Van De Sande v. Van De Sande* 431 F.3d 567, 571 (7th Cir. 2005).
[67]   *Khan* (n 38).
[68]   See *Walsh v. Walsh* 221 F.3d 204 (1st Cir. 2000).
[69]   Ibid., at 221.
[70]   *Gomez* 812 F.3d at 1012.

on Article 13(1)(b) should be developed.[71] Thus, the Permanent Bureau began a process in 2012 to develop the *Guide to Good Practice*[72] in cases where Article 13(1)(b) was being invoked. This resulted from the growing recognition by courts and governments of the impact of domestic violence on children and the increasing judicial use of the Article in Convention cases.[73] The increasing advocacy by attorneys and activists around the world, and the studies on Convention case outcomes mentioned above, including our own, also provided impetus.[74] The Guide was finally published in 2020 and is a step forward in that it includes references to the impact of domestic violence on children. For example, the Guide states: 'The exceptions serve a legitimate purpose, as the Convention does not contemplate an automatic return mechanism. Allegations that there is a grave risk should be promptly examined to the extent required by the exception, within the limited scope of return proceedings.'[75]

Going a step further, the Guide later states that:

> Harm to a parent, whether physical or psychological, could, in some exceptional circumstances, create a grave risk that the return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. The Article 13(1)(b) exception does not require, for example, that the child be the direct or primary victim of physical harm if there is sufficient evidence that, because of a risk of harm directed to a taking parent, there is a grave risk to the child.[76]

This is consistent with Weiner's recent argument that only 'exposure' is sufficient to establish grave risk.[77]

This Guide is one of a series of Guides to Good Practice published by the Permanent Bureau about the Convention, but is the first to focus on an exception in the Convention.[78] Lady Hale has discussed how development of this Guide revealed a series of competing views on how to implement Article 13(1)(b) resulting in numerous compromises during its development.[79] Weiner laments, however, that due to so many compromises, the resulting Guide is unexceptional and could have been much stronger in its grappling with domestic violence. She highlights that the final version of the Guide eliminated information in a helpful appendix and on how Central Authorities should protect sensitive information that might endanger battered mothers or their children. Also missing is detailed information from the large body of social science research that so clearly shows the co-occurrence of domestic violence and child physical abuse in the same families, as well as the danger that continues after a couple separate.[80]

---

[71]    Hale (n 7); HCCH (n 17).
[72]    HCCH (n 17).
[73]    Lowe and Stephens (n 8) noted that cases involving judicial refusals to return children based on Article 13(1)(b) increased from 26 in 1999 to 47 in 2015.
[74]    See, e.g., n 11 and n 62.
[75]    HCCH (n 17) at para 27.
[76]    Ibid., at para 33.
[77]    Weiner (n 9).
[78]    MH Weiner, 'The Article 13(1)(b) Guide to Good Practice' (October/November 2019) *Domestic Violence Report* 25(1), 7.
[79]    Hale (n 7).
[80]    Weiner (n 78).

Despite all these reservations, Weiner concludes, and we agree, 'The Guide will make evident that an Article 13(b) defence can exist when a child is exposed to domestic violence or when the child's caregiver cannot give care because of the domestic violence'.[81]

## Implementing National Legislation

The senior authors have consulted with US states and our own Central Authority (the US Department of State's Office of Children's Issues) on the Convention, domestic violence and Article 13(1)(b). We have also consulted with multiple other countries on their own cases and legislation, including Japan, India and Singapore. We were invited to Japan by their Ministry of Foreign Affairs as they grappled with whether to become a party to the Convention and what their implementing legislation should include. It was heartening to see so many women attorneys and activists in Japan working toward greater sensitivity to issues of domestic violence in the proposed implementing legislation. Japan did sign on to the Convention in 2014 and included new language on domestic violence in its implementing legislation. While earlier drafts stated that domestic violence should be grounds for denying a Convention petition for return of the child, the final legislative wording of the implementing legislation was watered down after pressure from other countries. It does, however, state that domestic violence should be considered as a factor when deciding on the petition for return.[82]

One author (Shetty) also consulted with the Chief Justice of the Singapore Supreme Court and the Minister of Women and Children in India. While Singapore is already a signatory to the Convention, India has yet to accede to it. As in Japan, there is a strong women's advocacy community in India that has pressured the government to hesitate going forward with the Convention unless protections for women and children can be strengthened. The Law Commission of India, in its 2016 report on the issues to consider when signing on to the Convention and on proposed implementing legislation, recognised domestic violence as a key issue.[83]

In our own country, we took part in an effort in the US to amend our implementing legislation to consider domestic violence when determining grave risk. This was sponsored by then US Congresswoman Ileana Ros-Lehtinen (Republican of Florida). The effort was not, at that time successful, but represented a beginning effort to create greater sensitivity to issues of domestic violence under the US implementing legislation, the International Child Abduction Remedies Act and the International Child Abduction Prevention and Return Act.[84]

These are all encouraging signs that the role of domestic violence in the lives of children is being considered by new countries contemplating signing on to the Convention and current

---

[81]  Ibid, at 7.

[82]  For an excellent discussion of Japan's decision to sign on to the Convention and how it developed its implementing legislation, see S Yamaguchi and T Lindhorst, 'Domestic Violence and the Implementation of the Hague Convention on the Civil Aspects of International Child Abduction: Japan and U.S. Policy' (2016) *Journal of International Women's Studies* 17(4), 16–30; see also T Hamano, 'The Aftermath of Japan's Ratification of the Hague Convention on Child Abduction: An Investigation into the State Apparatus of the Modern Japanese Family' (2017) *IAFOR Journal of Asian Studies* 3(1), 35–49.

[83]  Government of India and Law Commission of India, *Report No. 263: The Protection of Children (Inter-country Retention and Removal) Bill, 2016* (Report No. 263, October 2016).

[84]  22 U.S.C. § 9001 et seq; 22 U.S.C. § 9101 et seq.

108   *Research handbook on international child abduction*

signatories amending existing legislation. It is hoped that this trend continues and consideration of domestic violence exposure, and how it relates to grave risk to children, will be added to existing or future implementing legislation.

**The Hague Domestic Violence Project**

The Hague Domestic Violence (HagueDV) technical assistance project was established almost two decades ago at Seattle University School of Law's Access to Justice Institute (AtJI).[85] It was initiated in response to a mother who had fled to Seattle with two young children to escape from a violent husband in Europe. When the mother sought our help, we had never heard of the 1980 Hague Convention, nor had anyone else with whom we worked. One author (Shetty) created a project within Seattle University's AtJI that brought volunteer attorneys and law students together to aid battered mothers and their children fleeing across international borders to safety. The project also provided support for other attorneys across the US who were representing battered mothers in Convention proceedings.

The HagueDV project has moved, over the years, from Seattle University to the University of Minnesota's Humphrey School of Public Affairs and to the University of California, Berkeley's Goldman School of Public Affairs. It has recently moved to the American Bar Association (ABA) Commission on Domestic & Sexual Violence.[86] Its growth over two decades was supported by grants from the National Institute of Justice and the Office on Violence Against Women (OVW), both at the US Department of Justice.[87] The HagueDV project enlisted leading professionals and national organisations in:

- developing the new research mentioned earlier on US incoming Convention cases;[88]
- creating state-specific judicial bench guides as well as a model bench guide;[89]
- creating an attorney and advocate guide for representing battered mothers in Convention cases, titled *Representing Battered Respondents Under the Hague Convention on the Civil Aspects of International Child Abduction*;[90]
- creating new profession-specific and cross-training curricula for judges, attorneys and advocates;
- collaborating with national professional organisations and law firms to use the new curricula in national trainings for judges, attorneys and advocates; and

---

[85]   See S Shetty, 'Seeking Safety in America: The Hague Domestic Violence Techinical Assistance Project' (October/November 2019) *Domestic Violence Report* 25(1), 8, for further information on the HagueDV Project.

[86]   See https:// www .americanbar .org/ groups/ domestic _violence/ our -projects/ hague -dvproject/ , accessed 18 January 2023.

[87]   USDOJ NIJ grant #2006-WG-BX-0006; USDOJ OVW grant #2011-TA-AX-K075 and 2015-TA-AX-K038.

[88]   Lindhorst and Edleson (n 11).

[89]   Hon T Wiley Dancks and Hon DA Kaplan, Co-chairs, *The Hague Convention on the Civil Aspects of International Child Abduction in Cases Involving Battered Respondents: A New York Bench Guide for Federal and State Judges* (2017) Goldman School of Public Affairs Hague Domestic Violence Project, University of California, Berkeley.

[90]   JS Goldberg and S Shetty, *Representing Battered Respondents Under the Hague Convention on the Civil Aspects of International Child Abduction* (2015) Goldman School of Public Affairs Hague Domestic Violence Project, University of California, Berkeley.

- developing and expanding an online clearinghouse.

When Convention cases were heard in US courts, our project improved the likelihood that battered mothers and their children would have informed legal representation, advocacy and expert witnesses and that judges hearing these cases would better understand violence against women and the grave risk that return of children to an abusive father may raise for both the children and their mothers.

### Case Outcomes in the US

*Analysis of Published Cases:* The Permanent Bureau analysed cases in its INCADAT database in preparation for the Sixth Meeting of the Special Commission. Of 92 cases studied, they found that over a third (32, 34.7 per cent) resulted in a refusal to return the child on the basis of Article 13(1)(b).[91] They also reported that, in 32 cases, violence was alleged against both a parent and child,[92] consistent with our research on the co-occurrence of domestic violence and child abuse cited earlier.

We also sought to study US incoming Convention cases by examining published US judicial opinions that could serve as precedents in future litigation.[93] Once we removed cases that did not fit our criteria and consolidated multiple opinions, our final sample included 47 incoming Convention cases heard in US courts that had clear allegations of domestic violence. The majority of these cases (35, 74 per cent) were litigated in federal courts. Twenty-two states and Puerto Rico courts were also represented in our sample.

Of the 47 disputes, 22 (46.8 per cent) resulted in the dismissal or denial of a petition (meaning the children remained with the respondent – usually the mother – in the US). On the other hand, 20 disputes (42.6 per cent) resulted in the granting of a petition (meaning that the children were returned to their country of habitual residence). In five instances (10.6 per cent), the outcome could not be determined because the dispute was remanded to a lower court and no subsequent opinion was available. Although fewer than half of the cases were decided in favour of the mother, these cases tended to have larger numbers of children. Consequently, overall, return was denied for 58.9 per cent of the children who were in their mothers' care.

The US courts in our sample only accepted the grave risk defence in 12 of the 38 cases in which it was asserted. Looking more closely at these 12 cases, we explored the reasoning behind judicial decisions by examining passages of court opinions pertaining to grave risk. The results of our analyses suggested that the courts responded to five distinct factors when determining grave risk: (1) whether children were directly maltreated by the petitioning parent; (2) whether the children were exposed to the domestic violence of a parent; (3) whether the children suffered from Post-Traumatic Stress Disorder (PTSD); (4) whether the abuser made

---

[91]   HCCH Permanent Bureau, *Domestic and Family Violence and the Article 13 'Grave Risk' Exception in the Operation of The Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction: A Reflection Paper* (2011) Preliminary Document No 9.

[92]   Ibid., at 13.

[93]   Lindhorst and Edleson (n 11); WM Vesneski, T Lindhorst and JL Edleson, 'US Judicial Implementation of the Hague Convention in Cases Alleging Domestic Violence' (2011) *Juvenile and Family Court Journal* 62(2), 1–21.

threats to kill the children or others; and (5) whether there was expert testimony available.[94] Many of the successful cases included presentation of more than one of these key factors.

Our analyses indicated that US courts in our sample addressed these five distinct factors when determining whether grave risk could be used as an exception to returning a child in a Convention petition. It is important to note that this is quite a small sample of cases and that successful arguing for the grave risk exception usually included presenting multiple factors to the court. This pattern suggests that the presence of more than one factor has a cumulative effect of increasing the likelihood that the court will find the existence of grave risk. Our findings also suggest that expert witnesses played a key role in helping judges to better understand domestic violence and its potential future risk to the children in these cases.

*New Case Rulings on Grave Risk:* Recent rulings by the US Supreme Court and US judges in Convention cases have offered a glimmer of hope that a change is afoot. While the US Supreme Court has yet to iterate an exact test for an Article 13(1)(b) grave risk defence, it has articulated some guidance that will help fleeing victims of domestic violence. In *Abbott v. Abbott*, the US Supreme Court remanded a Convention case to decide questions of grave risk, stating that:

> If ... [the respondent] could demonstrate that returning to [the country of habitual residence] would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer 'psychological harm' or be placed 'in an intolerable situation'.[95]

In 2014, the US Supreme Court concluded that the Convention's purpose is to deter child abductions, but added that 'the Convention does not pursue that goal at any cost'.[96] The Supreme Court went on to note that the Convention addresses a child's interest to avoid harm citing Article 13(1)(b).[97] In 2019, the Supreme Court described the grave risk defence as 'a mechanism for guarding children from the harms of domestic violence'.[98]

Beyond our Supreme Court, several recent US court decisions show signs that courts are looking at Hague petitions with a broader understanding of Article 13(1)(b) and how domestic violence presents a grave risk to children. *In re MVU*, a 2020 decision from the Illinois Court of Appeals, the court concluded that domestic violence supported a mother's grave risk defence and rejected the notion that 'a spouse must endure years of violent abuse for this exception to be established' and concluded that the 'escalating pattern of verbal and physical abuse, which included restrictions on [the mother's movement and employment] … supports her asserted defense'.[99] The court cited the US Supreme Court's dicta and case law recognising that domestic violence can pose a grave risk to children.[100]

---

[94]  See JL Edleson. The Role of Expert Witnesses in Proving Grave Risk to Children (October/ November 2019) *Domestic Violence Report* 25(1), 5, for a more detailed discussion of use of expert witnesses in Convention cases.

[95]  *Abbott v. Abbott* 560 U.S. 1, 22 (2010).

[96]  *Lozano v. Montoya Alvarez* 572 U.S. 1, 16 (2014).

[97]  Ibid., at 16.

[98]  *Monasky v. Taglieri* 140 U.S. 719, 729 (2020): The court affirmed the returning of the child, finding that Italy was her habitual residence. However, Monasky did not appeal the lower court's finding that she did not meet her burden establishing grave risk. The court did not consider this issue.

[99]  *In re MVU* (n 51).

[100]  Ibid., at 762.

Other recent rulings include the US Ninth Circuit in *Colchester v. Lazaro*, reversing a return order after the district court did not adequately address domestic violence allegations in a grave risk defence, and the California Court of Appeals in *Noergaard v. Noergaard* finding that domestic violence constitutes a grave risk to children. In 2016, the US Eleventh Circuit held that evidence of domestic violence presented a grave risk to the child. The court concluded that:

> The Convention's exception also applies to the grave risk of psychological harm. It seems almost self-evident that a child raised in an environment where one parent is engaged in a sustained campaign of violence (including the use of deadly force) against the other parent faces just such a grave risk.[101]

In *Sadoun v. Guigui*, because domestic violence victims may not come forward to report abuse, the Southern District of Florida did not hold a lack of hospital or police records against the fleeing mother.[102] These decisions show a shift in recognising the threat that adult domestic violence poses to victims and their children.

Some circuits have, however, taken a narrower view of grave risk, including the US Fifth, Sixth, Eighth, and Tenth Circuits.[103] Still, these courts have considered adult domestic violence in Hague petitions. For example, the Tenth Circuit acknowledged that a history of spousal abuse can demonstrate a propensity for child abuse though the respondent must 'draw a connection' between the spousal abuse and a grave risk to the child.[104]

Often higher courts defer to the findings of lower courts. Even if legal precedent is less favourable to fleeing victims of domestic violence, lower courts exercise significant discretion in Convention cases. In 2012, the District Court of Minnesota, which is in the US Eighth Circuit, found that a father's prior spousal abuse and propensity for violence established that the children would be exposed to grave risk if returned to Peru. The court added that:

> There is no requirement under the Hague Convention that a child actually have been previously harmed physically or psychologically; rather, the relevant inquiry is whether returning the child to the country of his habitual residence would present a grave risk of such harm or otherwise place him in an intolerable situation.[105]

---

[101]   *Gomez v. Fuenmayor* 812 F.3d 1005, 1015 (11th Cir. 2016).

[102]   *Sadoun v. Guigui No. 1*:16-cv-22349-KMM 2016 WL 4444890 at *6 (S.D. Fla. Aug. 22, 2016).

[103]   The Second Circuit does consider adult domestic violence to establish grave risk, especially if the abuse occurred in the child's presence. However, respondents would need to show a 'sustained pattern of physical abuse and/or a propensity for violent abuse' – *Ermini v. Vittori* 758 F.3d 153, 164 (2d Cir. 2014). See also *Soto v. Contreras* 880 F.3d 706 (5th Cir. 2018): 'But, those cases do not require finding grave risk to the child when the child's parent was abused'; *Madrigal v. Tellez* 848 F.3d 669 (5th Cir. 2017); *Simcox v. Simcox* 511 F.3d 594 (6th Cir. 2007) where the court identified three situations of abuse from minor, serious, and a middle ground; *Nunez-Escudero v. Tice-Menley* 58 F.3d 374, 376-77 (8th Cir. 1995) where the father's physical, sexual and verbal abuse of the mother was not enough to constitute grave risk, because grave risk is concerned with whether the child would suffer upon return, not the parent; *Gil-Leyva v. Leslie* 780 Fed. Appx. 580, 590 (10th Cir. 2019).

[104]   *Gil-Leyva* (n 104) at 590.

[105]   *Acosta v. Acosta* No. 12–342 ADM/SER 2012 WL 2178982 at *8 (D. Minn. June 14, 2012) (unpublished).

112  *Research handbook on international child abduction*

## THE WAY FORWARD

The Convention is an important mechanism by which countries and individual courts may try to resolve these difficult cases of cross-border disputes involving child abduction. In 1980, when the Convention was drafted, there was little research on the impact of domestic violence exposure on children or the co-occurrence of domestic violence and child abuse. When we, along with our colleagues around the globe, started this work over two decades ago there was also little attention to allegations of domestic violence in Convention cases.

The capacity to respond sensitively to battered mother respondents in these cases has grown substantially over these years despite the limited resources brought to this work. At present, there is the Guide to Good Practice on Article 13(1)(b) and some promising language in newly drafted national implementing legislation. Multiple US states have judicial bench guides focused on allegations of domestic violence in Convention cases and a model bench guide exists to help other states and countries develop their own guides.

Many US attorneys have been trained on how to represent battered respondents. There is an increasing network of experienced attorneys as well as a practice guide to support new attorneys undertaking representation of these mothers. As a result, there are more instances of enlightened judicial rulings that understand the grave risk that domestic violence represents for children and an increasing awareness, on the behalf of governments, about the danger that adult domestic violence represents for children in the home.

Despite all this work, we continually hear from mothers fleeing harm and desperately seeking help to defend against petitions for the return of their children by abusive ex-partners. Clearly our work is hardly done, but the way forward is clearer than it was just ten years ago. The work ahead includes a number of efforts to improve safe outcomes for children and their mothers in Convention cases where domestic violence occurs.

We recommend that the Permanent Bureau:

(1)  encourage recognition that exceptions to the return of children are an integral part of the Convention and that rejection of narrow interpretations of grave risk are based on fear of undermining the Convention rather than on what is protective of children;

(2)  work to refocus the global administration of the Convention on its original goal of protecting children and away from its current overly technical focus on judicial administration and procedures;

(3)  assist Convention signatories in drafting and amending implementing legislation to explicitly recognise domestic violence against a mother as a possible grave risk of physical and psychological harm to children;

(4)  collect, and regularly report, systematic longitudinal data on the physical and psychological outcomes for children in the aftermath of Convention decisions;

(5)  convene an international panel of experts to develop and disseminate the most up-to-date information on the impact of domestic violence on the physical and psychological development of children to signatory countries for further distribution to their courts and professional legal associations;

(6)  facilitate strengthening of the Guide to Good Practice in a new, revised edition that includes more comprehensive information on domestic violence and the co-occurrence of physical child abuse, on how violence continues and possibly increases in danger

upon the couple's separation, and how to avoid sensitive information disclosures that endanger children and their mothers; and

(7)   coordinate more closely with international non-governmental organisations, such as Pathways to Safety International and the ABA HagueDV Project in the US and activist organisations such as FiLiA in the UK that work to support battered mothers and their children facing Convention petitions.[106]

We also believe that Central Authorities should:

(1)   create national panels of attorneys and expert witnesses who have experience in Convention cases that include allegations of domestic violence and are available to aid lawyers in their own country as well as across borders;

(2)   protect sensitive information that could endanger children and women from disclosure;

(3)   develop training programmes for attorneys and expert witnesses to better prepare them to represent battered mother respondents and their children in Convention cases in the country's courts; and

(4)   encourage attorneys to include information on domestic violence allegations and support the use of Article 13(1)(b) when a grave risk exists for children in Convention cases.

Finally, professional legal associations and domestic violence programmes should collaborate to develop and disseminate:

(1)   guides for attorneys litigating in Convention cases, particularly practitioners in Family Law, with information on domestic violence allegations and Article 13(1)(b);

(2)   guides and training curricula for attorneys and women's advocates that include information on how to screen clients for domestic violence;[107] and

(3)   guides and training curricula for attorneys and women's advocates on how to include expert testimony, psychological evaluations, and social science evidence on domestic violence when presenting an Article 13(1)(b) defence.[108]

We recognise that some of these recommendations may be met with concern in some quarters and raise questions about whether the Permanent Bureau or Central Authorities can, and should, engage in these activities. The goal of the Convention drafters in 1980, however, was children's safety and that continues to be our utmost focus. The current administration of the Convention at times conflicts with children's rights and best interests under national and international laws.[109] The Permanent Bureau and Central Authorities were created to implement the

---

[106]   Pathways to Safety International https:// pathwaystosafety .org The American Bar Association HagueDV Project. https:// www .americanbar .org/ groups/ domestic _violence/ our -projects/ hague -dvproject/ , and FiLia's Hague Mothers' Project https:// www .filia .org .uk/ latest -news/ 2022/ 3/ 2/ announcing-hague-mothers-a-filia-legacy-project, all accessed 18 January 2023.

[107]   RL Valente, *Understanding Your Client (Screening Clients) in the Impact of Domestic Violence on Your Legal Practice* (2nd edn, American Bar Association Commission on Domestic Violence).

[108]   Two federal appeal courts have reversed return orders finding that judges abused their discretion by not considering or allowing psychological evidence when respondents argued a grave risk existed for the child: *Khan v. Fatima* 680 F.3d 781, 786 (7th Cir. 2012); *Colchester v. Lazaro* 16 F.4th 712, 716 (9th Cir. 2021).

[109]   Schuz (2015) (n 11).

114    *Research handbook on international child abduction*

Convention and it is within our power to modify them and the Convention's implementation so as to maximise safety.

We, along with colleagues around the world, will continue to work to improve the administration of this Convention and how its signatory countries and their courts respond when allegations of domestic violence are raised. After decades of work on this issue, we remain hopeful that beneficial change is occurring and more will come in the future.